UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOSEPH PARKS,

                                        Plaintiff,

                                                        9:08-CV-0586
v.                                                      (TJM/GHL)

JOSEPH T. SMITH, et al.,

                                        Defendants.
_____

APPEARANCES:                            OF COUNSEL:

JOSEPH PARKS, 96-A-4387
Plaintiff *pro se*
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, New York 12589

HON. ERIC T. SCHNEIDERMAN              AARON M. BALDWIN, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, New York 12224

GEORGE H. LOWE, United States Magistrate Judge

## REPORT-RECOMMENDATION

        This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy,

Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Plaintiff Joseph Parks alleges that Defendants violated his right to exercise his religion when they

disciplined him for attempting to mail a photograph of himself with his hands in what he

characterizes as a prayer pose and Defendants characterize as a gang sign.  Currently pending

before the Court is Defendants' motion for summary judgment.  (Dkt. No. 51.)  For the reasons

that follow, I recommend that Defendants' motion be granted.

## I.        FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, who is now and was at all relevant times an inmate at Shawangunk Correctional

Facility ("Shawangunk"), was raised as a Jehovah's Witness, but did not fully accept the religion

until 2000 or 2001.  (Dkt. No. 51-8 at 6:6-11.[1])  Thereafter, Plaintiff prayed five or six times per

day.  *Id.* at 22:6-11.  Each time he prayed, Plaintiff placed his hands in a meditative hand

position.  *Id.* at 17:17-18:5.)  He assumed this hand position so that he could "make sure [he]

went before [his] Father clean.  Not just physically but mentally."  *Id*. at 22:16-21.  The hand

position is not mandated for all Jehovah's Witnesses, but Plaintiff's own research and study led

him to believe that he, personally, is required to use the hand position "[b]ecause where I am

spiritually and what I know pertaining to the Bible as well as research.  What you know holds

you accountable."  *Id.* at 24:11-17; 25:7-26:6.  Plaintiff believes that he cannot pray without

using the hand position.  *Id.* at 12:13-13:13, 31:3-18.

On February 27, 2007, Plaintiff attempted to mail a letter and photograph to a personal ad

service.  (Dkt. No. 51-4 at 2 ¶ 6.)  The photograph depicted Plaintiff, clad in a shirt and red pants,

sitting on a chair.  (Dkt. No. 51-6; Dkt. No. 51-8 at 16:14-18.)  Plaintiff's feet were placed wide

apart and his elbows were resting on his thighs.  (Dkt. No. 51-6.)  His hands were pressed

together with his fingertips pointed downward and his thumbs meeting at the top to form a heart

or diamond shape.  *Id.*  At his deposition, Plaintiff testified that he was not praying or meditating

---

[1]        Page numbers refer to the page number assigned by the Court's electronic filing
system.

when the picture was taken.  (Dkt. No. 51-8 at 28:14-16.)  Rather, he "was just trying to relax and

in the course of just trying to relax," he made the hand sign.  *Id.* at 28:14-23.  In the letter that

accompanied the photograph, Plaintiff indicated that he wanted "to begin a good friendship" with

"someone special" and hoped to "find my ideal woman who can complete me . . . as I complete

her."  (Dkt. No. 51-5 at 7.)  In the letter, Plaintiff referred to himself several times as a "spiritual"

person, but did not mention that he is a Jehovah's Witness.  (*Id.*; Dkt. No. 51-8 at 36:3-7.)  At his

deposition, Plaintiff testified that he included the photograph with the letter to "have a

resemblance of me. . . . [t]o show what I looked like."  (Dkt. No. 51-8 at 16:19-23.)  In a

declaration submitted in opposition to Defendants' motion for summary judgment, Plaintiff states

that he "included the photo, not only to show what I look like but to attract someone who

practices the same religion I do."  (Dkt. No. 55 at 36.)

     The photograph was taken in the gym at Shawangunk, and DOCS personnel screened it

before allowing Plaintiff to leave the gym with it.  (Dkt. No. 51-8 at 15:4-23.)  However, when

Defendant Corrections Officer Kim Skwera, who was assigned to review outgoing inmate mail

on February 27, 2007, saw the photograph, she "suspected that the photograph depicted

[Plaintiff] making a gang sign with both his hands."  (Dkt. No. 51-4 at 2 ¶¶ 6-7.)  Based on this

suspicion, Defendant Skwera "consulted with [Defendant] Senior Counselor Luis Franco, who

had training in these matters and was one of the staff members who regularly reviewed incoming

media and other materials to ensure that they do not contain any unauthorized gang material."  *Id.*

¶ 8.

     There is no written DOCS policy, procedure, or directive governing specifically how to

identify gang insignia or materials.  (Dkt. No. 51-3 at 3 ¶ 12.)  Rather, staff members such as

Defendant Franco receive training from the DOCS Central Intelligence/Special Investigations Unit.  *Id*. ¶ 13.  During this training, staff hear oral instruction and see examples of gang signs and symbols.  *Id*. ¶ 15.  The training includes "information on particular groups, such as 'The United Bloods Nation,' also known as 'The Bloods,' which is an unauthorized organization that is active and making an adverse impact within DOCS."  *Id*. at 4 ¶ 16.  Staff learn that "The Bloods original color is RED . . . Members' display of hand signs varies depending on the Set they belong to.  The most common hand sign is indicated by making a circle with the thumb and index finger, touching at the finger's tip and extending the remainder of the fingers."  *Id*. ¶ 17 (emphasis in original).

Based on this training, Defendant Franco concluded that the photograph depicted Plaintiff making a Bloods hand sign.  *Id*. at 5 ¶ 22.  He reached that conclusion because of the "manner in which the plaintiff is holding his hands together, facing downwards, in a heart or triangular shaped fashion with the fingers and thumbs touching" and because Plaintiff was wearing red pants in the picture.  *Id.* at ¶¶ 23-24.

Accordingly, Defendant Skwera wrote a misbehavior report charging Plaintiff with, *inter alia*, violating DOCS Rule 105.12.  (Dkt. No. 51-4 at 2 ¶ 10.)  That rule, which has since been repealed, stated that "an inmate shall not engage in or encourage others to engage in unauthorized organizational activities or meetings, or display, wear, possess, distribute or use unauthorized organizational insignia or materials."  N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2 (2004).

The disciplinary hearing regarding the misbehavior report was held on March 2 and 7, 2007.  (Dkt. No. 51-5 at 3, 13.)  Defendant Lt. G. Gardner served as the hearing officer.  *Id*. at 3. Plaintiff alleges that Defendant Gardner "created a hostile environment, using intimidation

4

tactics of taunting and facial gestures."  (Dkt. No. 1 at 8 ¶ 16.)

Plaintiff called Defendants Skwera and Franco as witnesses.  (Dkt. No. 51-5 at 3.)

Defendant Skwera testified that she did not speak to anyone other than Defendant Franco about the hand sign.  *Id.* at 6.  Defendant Franco testified that, based on his experience, Plaintiff's hand position was "clearly . . . an unauthorized hand sign."  *Id.* at 9.  Plaintiff showed Defendant Franco pictures of several meditation hand signs and asked if he was familiar with them.  *Id.* at 9-10.  Defendant Franco testified that the "only religious . . . group that comes close to that type of hand sign . . . would be the Rastafarians. . . . [T]hat's the only one I'm familiar with.  I am not familiar with . . . meditation . . . at all."  *Id.* at 12.

Plaintiff told Defendant Gardner that he is a religious man, that there is a religious justification for the hand gesture, and that because he had "been trained for a period of time within my meditation . . . I reacted when trying to get calm for the picture."  *Id.* at 12, 14.

Defendant Gardner found Plaintiff guilty of the unauthorized organizations and activities charge.  *Id.* at 16.  He stated that he relied on Defendant Skwera's report, Plaintiff's testimony that the hand sign was a form of meditation, Defendant Franco's testimony "verifying that the hand sign is that of an unauthorized organization known as the Bloods," and the photograph itself in reaching his decision.  *Id.* at 17.  He imposed a penalty of fifteen days' keeplock, thirty days' loss of packages and events, and fifteen days' loss of commissary and phone privileges.  *Id.*  He stated that the reason for his decision was "to impress upon the inmate that unauthorized organizations or displays with the hand signs are prohibited."  *Id.*

Plaintiff appealed Defendant Gardner's decision.  (Dkt. No. 51-5 at 18.)  In his appeal, he stated that the hand sign he made in the photograph was "an unconscious gesture that is relevant

5

to my religious beliefs . . . so to find me guilty is to infringe on my Constitutional rights that guarantee[] me freedom of religion, and freedom of speech and equal protection under the law." *Id.* at 40.  Defendant John Maly, acting as Defendant Superintendent Joseph T. Smith's designee, affirmed the disposition on March 21, 2007.  *Id*. at 18.

On March 12, 2007, Plaintiff filed a grievance with Defendant J. Krom, the facility's inmate grievance supervisor, alleging that Defendant Gardner was biased, had deprived Plaintiff of due process, and had deprived Plaintiff of the free exercise of his religion.  (Dkt. No 1 at 9 ¶ 21.)  Plaintiff also alleged that Defendant Smith allowed "a pattern of unchecked, unconstitutional conduct to take place at the hearings. . . due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such."  *Id.*  When Krom did not reply within three weeks, Plaintiff filed an appeal of his grievance with Defendant Smith.  *Id.* ¶ 22.  When Plaintiff did not receive a reply within four weeks, he appealed to Defendant Thomas G. Egan, the facility's inmate grievance director.  *Id.* at 9-10 ¶ 23.  Plaintiff did not receive a response.  *Id*. at 10 ¶ 24.)

Plaintiff filed the complaint in this action on June 4, 2008.  (Dkt. No. 1.)  Plaintiff 's complaint asserted eight causes of action: (1) a First Amendment free exercise claim or, in the alternative, a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"); (2) a claim that Defendants "retaliated against Plaintiff due to him exercising his right to express his religious views"; (3) a claim under the Equal Protection Clause, claiming that Defendants deprived "Plaintiff[] of free exercise of religion, while allowing other religious groups free exercise of religion"; (4) a First Amendment freedom of expression claim; (5) a claim that Defendants violated the Due Process Clause by "refusing to provide [Plaintiff] with a

tier hearing consistent with his constitutionally protected rights"; (6) a claim that Defendants violated the Due Process Clause by failing to respond to his grievance; (7) a claim of racial discrimination; and (8) a claim that Defendants conspired to violate his constitutional rights. (Dkt. No. 1 at 11-12.) Plaintiff requests $1,000.00 for each day he was deprived of his right to practice his religion, the reversal of his disciplinary sentence, and costs. *Id.* at 13.

Defendants moved for judgment on the pleadings. (Dkt. No. 20.) As a result of that motion, the Court dismissed six of Plaintiff's claims. (Dkt. No. 30.) Plaintiff's sole remaining claims are that Defendants violated his religious rights under the First Amendment and RLUIPA and retaliated against him for exercising his religious rights. Defendants now move for summary judgment of those claims. (Dkt. No. 51.) Plaintiff has opposed the motion. (Dkt. No. 55.) Defendants have filed a reply. (Dkt. No. 56-2.)

## II.     APPLICABLE LEGAL STANDARDS

### A.     Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,*, 272-73 (2d Cir. 2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id*. The nonmoving party must do more than "rest upon the mere allegations . . . of his pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 585-86 (1986).  Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material[2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 309 (2d Cir. 2008).

### B.    Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Schwartz v. Compagnise Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968) (citations omitted).   As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment."  *Id.*; *accord, Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").  Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted.  In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*,

---

[2]     A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

"a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not shown -- that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949.

## III.    ANALYSIS

### A.    RLUIPA

Plaintiff claims that Defendants violated his rights under RLUIPA. (Dkt. No. 1 at 11.) RLUIPA provides that

> [n]o government shall impose a substantial burden on the religious

9

exercise of a person residing in or confined to an institution[3] . . . unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Defendants argue that Plaintiff's RLUIPA claim should be dismissed because (1) Plaintiff was not disciplined for engaging in a "religious exercise"; (2) even if Plaintiff was engaged in a religious exercise, it was not substantially burdened by the misbehavior report and disciplinary sentence; (3) Defendants acted in furtherance of a compelling governmental interest and used the least restrictive means of furthering that interest; and (4) RLUIPA does not authorize money damages.  (Dkt. No. 51-10 at 6-13.)

    1.    <u>Whether Plaintiff Was Engaged in a Religious Exercise</u>

Defendants argue that they are entitled to judgment because Plaintiff has not raised a triable issue of fact that he was disciplined for engaging in a "religious exercise."  (Dkt. No. 51-10 at 8-9.)  I find that Plaintiff has raised a triable issue of fact on this issue.

Under RLUIPA, a "religious exercise" is "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A). Defendants argue that Plaintiff was not engaged in an "exercise" because "[P]laintiff admits that he was neither praying nor meditating in the photograph that gave rise to the misbehavior report." (Dkt. No. 51-10 at 8.)

The evidence shows that while Plaintiff was not actively praying or meditating in the

---

[3]    An "institution" is, *inter alia*, "a jail, prison, or other correctional facility."  42 U.S.C. § 1997(1)(B)(ii) (2003).

photograph, he has maintained since the incident occurred that his hand gesture in the photograph was the result of his prayer practice.  At his disciplinary hearing, he told Defendant Gardner that because he had "been trained for a period of time within my meditation," he "reacted" with the hand sign "when trying to get calm for the picture."  (Dkt. No. 51-5 at 12, 14.)  Plaintiff testified at his deposition that he "fell into [his] meditation gesture unconsciously" as he was "trying to relax for the picture." (Dkt. No. 51-8 at 29:7-11.)  Defendants have not cited, nor can I find, any case law discussing whether such an unconscious manifestation of one's faith (which seems akin to the practice of some Catholics to reflexively cross themselves in moments of stress) is an "exercise" within the meaning of RLUIPA.  Because the burden on a motion for summary judgment is on the moving party, and because I must view the facts in the light most favorable to Plaintiff, I therefore find that Defendants have not established as a matter of law that Plaintiff was not engaged in an "exercise" of religion.

Defendants argue that even if Plaintiff was engaged in an "exercise," it was not "religious" because (1) the Jehovah's Witness religion does not require adherents to assume any special position when praying; and (2) the way Plaintiff is holding his hands in the photograph is different than the hand poses depicted in the book from which Plaintiff says he adopted the prayer practice.  (Dkt. No. 51-10 at 8-9.)

Courts analyzing RLUIPA claims use the First Amendment "sincerely held religious beliefs" standard to determine whether a plaintiff was engaged in a "religious" exercise.  *See, e.g., Pugh v. Goord*, 571 F. Supp. 2d 477, 504-05 (S.D.N.Y. 2008); *Singh v. Goord*, 520 F. Supp. 2d 487, 498 (S.D.N.Y. 2007).  Under that standard, a religious belief is "sincerely held" when the plaintiff subjectively and sincerely holds a particular belief that is religious in nature.  *Ford v.*

11

*McGinnis*, 352 F.3d 582, 590 (2d Cir. 2003).

Courts have routinely expressed reticence about deciding, on summary judgment, whether or not an individual's beliefs are sincere.  As the Second Circuit has noted, "the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs" because the "[s]incerity analysis is exceedingly amorphous, requiring the factfinder to delve into the claimant's most veiled motivations. . . . " *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984).

The fact that the prayer gesture employed by Plaintiff is not mandated by any central authority of the Jehovah's Witness faith is immaterial to the sincerity analysis.  As the Supreme Court has noted:

> Intrafaith differences . . . are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses. . . . [T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect.  Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether [a party or another member of his faith] more correctly perceived the commands of their common faith.  Courts are not arbiters of scriptural interpretation.

*Thomas v. Review Bd. of the Indiana Empl. Sec. Div.*, 450 U.S. 707, 715-16 (1981) (holding that one Jehovah's Witness's belief that his religion prevented him from working in area of factory that produced tank turrets was sincere, despite fact that another Jehovah's Witness believed that such work did not violate the faith).

Similarly, I cannot conclude as a matter of law that Plaintiff's conduct was not sincere because his hand position in the photograph did not perfectly match the pictures in the book from which he adopted the pose.  As a matter of fact, of course, a reasonable juror could consider this issue and conclude that the imperfection of the hand pose is evidence that Plaintiff's assertion is

insincere and that he was, in fact, making a gang sign.  But a reasonable juror could also conclude that the imperfection of the hand pose supports Plaintiff's claim that he unconsciously assumed the position, honed from years of using it to pray five or six times per day, in order to relax.  But as a matter of law, I cannot credit one interpretation over the other.  The Supreme Court has cautioned that the "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit . . . protection." *Thomas*, 450 U.S. at 714.  Further, "[c]ourts should not undertake to dissect religious beliefs because the . . . [plaintiff's] beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id*. at 715.

Finally, I note that *Farid v. Smith*, 850 F.2d 917 (2d Cir. 1988), cited by Defendants, is distinguishable.  In that case the plaintiff "neither alleged nor submitted any proof that he sincerely h[eld] to any religious belief that mandates the use of Tarot cards. . ." *Farid*, 850 F.2d at 926.  Here, Plaintiff has maintained since before filing this lawsuit that the hand gesture in the photograph was religious in nature and has submitted voluminous declarations to that effect.

Therefore, I find that Plaintiff has raised a triable issue of fact that he was engaged in a "religious exercise."

2.   <u>Substantial burden</u>

RLUIPA prohibits only government action that places a "substantial burden" on religious exercise.  42 U.S.C. § 2000cc-1(a).  Defendants argue that even if Plaintiff was disciplined for engaging in a religious exercise, that punishment did not place a "substantial burden" on Plaintiff.  (Dkt. No. 51-10 at 9-11.)  I find that Plaintiff has raised a triable issue of fact on this issue.

13

A prisoner's sincerely held religious belief is substantially burdened "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (punctuation omitted).

Defendants argue that Plaintiff's religious exercise has not been substantially burdened because Plaintiff can still pray in the privacy of his living quarters or "in designated religious areas whenever feasible as determined by the Superintendent" and because "Plaintiff is allowed to use . . . meditation poses . . . while praying . . . . " (Dkt. No. 51-10 at 10.)  Defendants cite Defendant Franco's declaration as support for the latter assertion.  In the cited paragraph, Defendant Franco declares that "Plaintiff would be allowed to use those 'meditation poses' depicted in his Complaint while praying . . . , *which poses are different from that unauthorized group symbol made by the plaintiff in the photograph* . . . . " (Dkt. No. 51-3 at 6 ¶ 33, emphasis added.)  In other words, Defendants argue that Plaintiff's religious exercise has not been substantially burdened because he can still pray, but only if he does it in designated areas and only so long as he does not use the prayer gesture he unconsciously assumed on February 27, 2007.  I cannot find as a matter of law that such restrictions do not place substantial pressure on Plaintiff to modify his behavior and to violate his beliefs.  A reasonable juror could conclude that this pressure was substantial, and another reasonable juror could conclude that this pressure was not substantial.  Therefore, Plaintiff has raised a triable issue of fact that Defendants substantially burdened his religious exercise.

> 3.   Least Restrictive Means of Furthering a Compelling Governmental Interest

Under RLUIPA, government officials may substantially burden an inmate's religious exercise if they are motivated by a compelling governmental interest and use the least restrictive

means of furthering that interest.  42 U.S.C. § 2000cc-1(a).  The burden of proving this element

is on Defendants.  *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010) ("[T]he state may overcome

a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling

governmental interest and was the least restrictive means of furthering that interest.").

      Defendants argue that they were motivated by the compelling governmental interest of

preventing gang activity and that their "zero tolerance" policy is the least restrictive means of

furthering that interest.  (Dkt. No. 51-10 at 11.)  Defendant Franco's declaration discusses, at

length, the security problems posed by gang activity within the DOCS system.  Defendant Franco

declares that "DOCS has seen an increase" in gang activity "in recent years that has compelled

the Department to take steps to slow the growth of these groups and monitor them closely."

(Dkt. No. 51-3 at 2 ¶ 5.)  Defendant Franco declares that gangs:

> often use seemingly innocuous but covert means of identifying
> themselves and communicating with other members both within and
> outside correctional facilities.  These include the use of code words,
> slang, hidden messages (sometimes contained in letters or newspaper
> classified advertisements), and signs, symbols, and insignia which
> can range from anything [from] wearing certain color clothing or
> jewelry, to tattoos, and the use of hand signs, symbols and gestures,
> whether in person or in photographs.

*Id*. ¶ 6.

      "Prison security and penological institutional safety goals are indeed a most compelling

governmental interest . . . " *Campos v. Coughlin*, 854 F. Supp. 194, 207 (S.D.N.Y. 1994)

(Sotomayor, J.); s*ee also Orafan v. Goord*, 411 F. Supp. 2d 153, 160 (N.D.N.Y. 2006), *rev'd on

other grounds*, *Orafan v. Rashid*, 249 Fed. App'x 217 (2d Cir. 2007).  Courts must be sensitive to

these interests and apply RLUIPA's "compelling interest" standard "with 'due deference to the

experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of costs and limited resources.'" *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005).  This, however, does not end the inquiry.

In *Jova v. Smith*, 582 F.3d 410, 415 (2d Cir. 2009), the Second Circuit noted with approval that "[o]ther circuits have . . . recognized that the state may not merely reference an interest in security . . . in order to justify its actions. . . ."  Indeed, "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet [RLUIPA's] requirements." *Id*. at 416 (quoting 146 Cong. Rec. S7775 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy on RLUIPA)).  The Second Circuit also noted with approval that "[o]ther circuits . . . have required that, for a state to demonstrate that its practice is the least restrictive means, it must show that it 'actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.'" *Id*. (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005)).  As another district court has noted, *Jova* thus suggests that Defendants are required to present evidence of having considered less restrictive practices.  *Forde v. Baird*, 720 F. Supp. 2d 170, 180 (D. Conn. 2010).

Defendant Franco declares that an "absolute ban or 'zero tolerance policy' enforceable through the disciplinary system when rule violations occur for displaying, wearing, possessing, distributing or using unauthorized organizational insignia or materials is the only way that DOCS can meaningfully attempt to prevent and curtail unauthorized group activity in this regard in correctional facilities."  (Dkt. No. 51-3 at 3 ¶ 9.)  Otherwise, he states:

16

> it would be unduly burdensome on facility staff, if not impossible, to prevent the unlimited dissemination or use of unauthorized organizational insignia or materials throughout the correctional systems which would be highly dangerous.  Without a zero tolerance policy, the prohibitions could also be applied . . . inconsistently from one situation to another.

*Id.* ¶ 10.

Although this is a close question, I find that Defendant Franco's declaration adequately meets Defendants' burden of showing, as a matter of law, that they had a compelling interest and used the least restrictive means to further that interest when they disciplined Plaintiff for attempting to mail a photograph of himself wearing red pants and making a hand gesture that resembled one used by the Bloods.  If Plaintiff had been punished simply for making the hand sign, particularly in his cell or in some other area designated for inmate prayer, I would likely recommend that the Court deny Defendants' motion for summary judgment.  However, Plaintiff was attempting to disseminate the photograph and, in DOCS' experience, gang members sometimes use hidden messages in newspaper classified advertisements to communicate.  (Dkt. No. 51-3 at 2 ¶ 6.) Accordingly, applying the due deference I must give to prison administrators in establishing necessary procedures to maintain security, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's RLUIPA claim.

     5.     <u>Availability of Money Damages</u>

Defendants argue that even if Plaintiff had raised a triable issue of fact and could proceed to trial on his RLUIPA claim, he would be entitled only to injunctive relief.  (Dkt. No. 51-10 at 13.)  Defendants are correct.

RLUIPA allows prevailing plaintiffs to recover "appropriate relief against a government."

42 U.S.C. § 2000cc-2(a). The United States Courts of Appeals are divided on the issue of whether "appropriate relief" includes money damages. *Compare Madison v. Commonwealth of Virginia*, 474 F.3d 118, 131-32 (4th Cir. 2006) (money damages not available) *with Smith v. Allen*, 502 F.3d 1255, 1265 (11th Cir. 2007) (money damages available). The Second Circuit has not resolved the issue. The consensus of opinion among district courts in the Second Circuit is that RLUIPA does not authorize suits for money damages. *See Pugh v. Goord*, 571 F. Supp. 2d 477, 506-09 (S.D.N.Y. 2008). The issue is currently pending before the Supreme Court in *Sossamon v. Texas*, 560 F.3d 316 (5th Cir. 2009), *cert. granted* __U.S. __, 130 S.Ct. 3319 (2010) (argued Nov. 2, 2010). In the event that the District Court concludes that Plaintiff has raised a triable issue of fact as to his RLUIPA claim and, at that time, the Supreme Court has not yet issued a decision in *Sossamon*, I would recommend that the Court allow only Plaintiff's RLUIPA claim for injunctive relief to proceed.

### B.    Free Exercise Clause Claim

Plaintiff claims that Defendants violated his First Amendment right to freely exercise his religion. (Dkt. No. 1 at 11.) Defendants argue that they are entitled to summary judgment dismissing Plaintiff's claim, for the same reasons that they asserted regarding the RLUIPA claim. (Dkt. No. 51-10 at 6-13.) Defendants are correct.

Under the Free Exercise Clause of the First Amendment, a prison regulation or individualized decision to deny a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord*, 467

F.3d 263, 274 (2d Cir. 2006) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (punctuation omitted).

To establish a free exercise claim, a prisoner "must show at the threshold that the disputed conduct substantially burdens[4] his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274-75 (citing *Ford*, 352 F.3d at 591).  Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (quoting *Ford*, 352 F.3d at 595) (punctuation omitted).  When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests.  *Salahuddin*, 467 F.3d

---

[4]       Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test.  "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied.  Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord*, 571 F. Supp. 2d 477, 497 n.10 (S.D.N.Y. 2008)(citations and some punctuation omitted).

at 274.

Here, as discussed above, Defendants have established that they are entitled to judgment under the strict RLUIPA compelling interest standard. Accordingly, they are also entitled to judgment under the less stringent First Amendment standard. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's claim under the Free Exercise Clause.

### C.    Retaliation

Plaintiff claims that Defendants retaliated against him for exercising his right to freely exercise his religion. (Dkt. No. 1 at 11.)

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill*, 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official--even those otherwise not rising to the level of a constitutional violation--can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), *overruled on other*

20

*grounds*, *Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

To prevail on a retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff–namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action--in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.   *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Gill*, 389 F.3d at 380 (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d. Cir. 2001)).

Defendants argue that Plaintiff's conduct was not protected because Plaintiff "was not praying or meditating in the photograph which led to the misbehavior report." (Dkt. No. 51-10 at 11-12.)  As discussed above, Plaintiff has raised a triable issue of fact that he was engaged in a religious exercise in the photograph.  Therefore, I find Defendants' argument regarding the first prong to be without merit.

Regarding the second prong, Defendants concede that "the misbehavior report constitutes adverse action . . ." (Dkt. No. 51-10 at 11.)

Regarding the third prong:

> [t]o satisfy the causal-connection prong of a retaliation claim, an inmate must show that the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff.  The court may consider a number of factors when determining whether a causal connection exists, including (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3)

vindication at a hearing on the matter; and (4) statements by the
defendant concerning his motivation.

*Vega v. Artus*, 610 F. Supp. 2d 185, 207 (N.D.N.Y. 2009) (citations and punctuation omitted)

(Suddaby, J.).

Here, there is simply no evidence in the record from which a reasonable juror could

conclude that Defendants were substantially motivated by Plaintiff's religion.  Defendants Franco

and Skwera have both filed declarations stating that they were not aware of Plaintiff's religion

until they heard him testify at the disciplinary hearing.  (Dkt. No. 51-3 at 5-6  ¶¶ 27-30; Dkt. No.

51-4 at 4-5 ¶¶ 21-25.)  Although Defendant Gardner was aware of Plaintiff's faith when he found

Plaintiff guilty of the disciplinary charge, there is no evidence in the record that he was

substantially motivated by Plaintiff's religion to punish Plaintiff.  Although the complaint

characterizes Defendant Gardener's conduct at the hearing as "hostile" and "intimidating" (Dkt.

No. 1 at 8 ¶ 16), nothing in the transcript indicates that Defendant Gardener said anything

derogatory about Jehovah's Witnesses or people who use hand poses to pray.  As for the other

defendants, Plaintiff asserts that they must have known about his religion because, when he

became a Jehovah's Witness, he filled out a form designating Jehovah's Witness as his religion.

(Dkt. No. 51-8 at 6:2-20.)  However, there is no evidence that any of the named defendants were

aware of that form.  Accordingly, I find that Plaintiff has not raised a triable issue of fact that

there was a causal connection between his protected conduct and the adverse action.  Therefore, I

recommend that the Court grant Defendants' motion and dismiss Plaintiff's retaliation claim.

### D.    Personal Involvement

Defendants argue that, even if Plaintiff had raised a triable issue as to any of his

22

substantive claims, the claims against several Defendants should be dismissed for lack of personal involvement.  (Dkt. No. 51-10 at 18-22.)  Defendants are correct.

Under Second Circuit precedent, "'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct.  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985).  In other words, supervisory officials may not be held liable merely because they held a position of authority.  *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).  Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[5]

---

[5]     In *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009), the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather

1.      Claims Against Defendant Smith

Plaintiff claims that Defendant Smith violated his constitutional rights by (1) designating Plaintiff's appeal of the disciplinary decision to Defendant Maly, who then affirmed the decision (Dkt. No. 1 at 9 ¶¶ 19-20); (2) ignoring Plaintiff's grievance (Dkt. No. 1 at 9-10 ¶¶ 22-23); and (3) allowing "a pattern of unchecked, unconstitutional conduct to take place at the hearings . . . due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such."  (Dkt. No 1 at 9 ¶ 21.)  Even if Plaintiff had raised a triable issue of fact as to his substantive claims, he has not raised a triable issue of fact that Defendant Smith was personally involved.

Regarding the appeal, the evidence shows that Defendant Smith personally took no action at all.  Even if he had handled Plaintiff's appeal personally rather than designating the task to Defendant Maly, courts have held that "merely affirming the hearing determination is not a sufficient basis to impose liability."  *Woodward v. Mullah*, No. 08-CV-463A, 2009 WL 4730309, at *2-3 (W.D.N.Y. Dec. 7, 2009).[6]  Although the Second Circuit once held that allegations that a superintendent affirmed a prisoner's conviction on administrative appeal were sufficient to allow the case to survive summary judgment[7], district courts in this Circuit have often distinguished that case by noting that liability only attaches if the supervisory official "proactively participated

_____

than the official's knowledge of subordinates' actions or policies.  The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories.  Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories.  *See Sash v. United States*, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009) (collecting cases).  I will assume for the purposes of this motion that *Colon* remains good law.

[6]      The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

[7]      *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986).

in reviewing the administrative appeals as opposed to merely rubber-stamping the results."
*Woodward,* 2009 WL 4730309, at *2-3.  Here, there is no evidence that Defendant Smith
proactively participated in the review.

A prisoner's allegation that a supervisory official failed to respond to a grievance is
insufficient to establish that official's personal involvement.  *Rivera v. Goord*, 119 F. Supp. 2d
327, 344-45 (S.D.N.Y. 2000).  *See also Watson v. McGinnis,* 964 F. Supp. 127, 130 (S.D.N.Y.
1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient
to establish liability.").  Thus, Defendant Smith's alleged failure to respond to Plaintiff's
grievance does not constitute personal involvement.

Finally, Plaintiff has not produced any evidence of "a pattern of unchecked,
unconstitutional conduct" at hearings, much less any that occurred "due to an unwritten
Shawangunk policy promoting, encouraging and/or condoning such."  (Dkt. No 1at 9 ¶ 21.)
Therefore, Plaintiff has not raised a triable issue of fact that Defendant Smith was personally
involved in any alleged constitutional violations.

2.      Claims Against Defendant Maly

Plaintiff's only claim against Defendant Maly is that he affirmed the disciplinary
conviction.  (Dkt. No. 1 at 9 ¶¶ 19-20.)  As discussed above, such a claim is insufficient to
establish personal involvement unless there is evidence that the defendant was proactively
involved in the appeal.  Here, there is no such evidence regarding Defendant Maly.  Therefore,
Plaintiff has not raised a triable issue of fact that Defendant Maly was personally involved in any
alleged constitutional violations.

3.      Claims Against Defendants Krom and Egan

Plaintiff's only claim against Defendants Krom and Egan is that they ignored his grievance.  (Dkt. No. 1 at 9-10 ¶¶ 22-24.)  As discussed above regarding Defendant Smith, this is insufficient to establish personal involvement.  Therefore, Plaintiff has not raised a triable issue of fact that Defendants Krom and Egan were personally involved in any alleged constitutional violations.

**ACCORDINGLY**, it is

**ORDERED** that the Clerk provide Plaintiff with a copy of *Woodward v. Mullah*, No. 08-CV-463A, 2009 WL 4730309 (W.D.N.Y. Dec. 7, 2009) in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009); and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 51) be **GRANTED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: March 29, 2011

Syracuse, New York

George H. Lowe
United States Magistrate Judge

26